**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

LINCOLN NATIONAL LIFE INSURANCE )
COMPANY,                        )
                                )
      Plaintiff,                 )
                                )
      v.                         )          CAUSE NO. 1:04-CV-396 TS
                                )
TRANSAMERICA FINANCIAL LIFE     )
INSURANCE COMPANY,              )
                                )
      Defendant.                 )

**OPINION AND ORDER**

On October 22, 2004, the Plaintiff, Lincoln Life Insurance Company, sued the Defendant, Transamerica Financial Life Insurance Company, for infringing its U.S. Patent No. 6,611,815 ('815 Patent). The Patent relates to a data processing method for administering an annuity product having an account value and a guarantee of lifetime payments. The Plaintiff alleges that the Defendant willfully and deliberately infringed this patent by selling annuities under its Guaranteed Principal Solution Rider and 5-for-Life Rider options.

As directed by the Court, the parties submitted their claim construction briefs and supporting materials. The Court also held an oral argument on claim construction. After the argument, the parties submitted additional briefs. Having reviewed these voluminous materials and having considered the parties' arguments at the hearing, the Court now issues its findings regarding the claim construction of the '815 Patent.

**A.    The '815 Patent**

**(1)    *Background of the Invention***

Annuities are insurance contracts where a person pays a sum of money in return for guaranteed payments for a designated amount of time. Typically, annuities are used to sustain retirees, providing them with security against outliving their financial resources. (*See* '815 Patent, 1:29–33.) Annuity contracts may guarantee payments for a certain number of years or for the life of the annuitant. Also, the contracts may guarantee a minimum amount to be paid out regardless of any contingency. The annuity may cover one or several persons. (*See id.* 1:45–60.)

Regardless of the specific variations within the contracts, annuities generally fall into two categories: immediate and deferred annuities. In immediate annuities, the insured pays a lump sum of money to the insurer who then instantly begins periodic payments to the insured according to the terms of the contract. (*Id.* 1:41–44.) Traditionally, deferred annuities have two distinct phases: accumulation and distribution. During the accumulation, also know as the deferral phase, the policy owner amasses assets (in the form of premiums) over a period of time to be sustained during retirement years. (*Id.* 1:37–41.) The accumulated money is said to have an account value and can be withdrawn at any time by the owner. (*Id.* 3:52–57.) During the distribution phase, also known as the payout or post-annuitization phase, the insured receives regular payments under the terms of the contract but no longer has access to the accumulated money as the account value ceases to exist. (*Id.* 3:57–61.) "The point of time where the accumulated value of the deferred annuity is exchanged for a promise by the insurer of a series of future retirement income benefits payments is termed 'annuitization.'" (*Id.* 2: 42–46.)

Annuities are further classified as fixed and variable. In a fixed annuity, the insurer bears the investment risk because it guarantees set payments during the distribution phase regardless of the performance of the investment. (*Id.* 1:66–2:8.) The account value of the fund is guaranteed to

increase with time. In a variable annuity, the insured bears the investment risk. The account value of a variable annuity can increase or decrease with time, depending on the performance of the fund during the accumulation phase. In addition, the amount of benefit payments during the distribution phase may vary from month to month, depending on market fluctuations. (*Id.* 2:9–32.)

Because the traditional annuities lose their account value in the distribution phase, many contract-holders of these instruments choose not to annuitize (convert a deferred annuity to an immediate annuity). Instead, they make systematic withdrawals from their accounts while maintaining them in their active, or accumulation, phase. Such systematic withdrawals are an alternative mechanism to annuitization for distributing retirement income. However, while these programs maintain account value, they may not last for the life of the contract owner. For example, if the withdrawals are set at a specified dollar amount, the account value may become depleted even as the contract holder is still in need of an income stream. On the other hand, if withdrawals are set as a percent of account value, the period of distribution may be extended indefinitely but without a meaningful level of monthly retirement income. (*Id.* 3:52–4:21.)

**(2)** *Summary of the Plaintiff's Invention*

In applying for the '815 Patent, the Plaintiff sought to create an annuity that was superior to both the annuitization and systematic withdrawal programs. The Plaintiff envisioned a method that

> joins the two programs seamlessly so as to provide lifetime income annuities which, for example may provide systematic withdrawals of principal and earnings over a specified number of years, and after systematic withdrawals have exhausted the account value, continue periodic payments for the remaining life of

3

the annuitant. When death of the annuitant(s) occur(s), any remaining account
value would typically be paid to the annuitant's beneficiary(ies).

(*Id.* 4:23–35.)

The new method maintains an account value, which can be accessed for withdrawals, even as the contract-holder gets regular disbursements. Moreover, the contract-holder can keep making additional deposits thus increasing the account value and, possibly, the distribution amounts. (*Id.* 13:20–24.) The "costs associated with continuing periodic payments to the annuitant after such payments have exhausted the account value is covered either explicitly or implicitly by any of a variety of means [e.g. asset charge, a load type charge, or a fixed deduction from every periodic payment]." (*Id.* 4:64–67; 6:8–7:51.) The invention applies to both fixed and variable annuities. (*Id.* 5:25–62.)

**(3)**     *The Prosecution History of the '815 Patent*

On January 2, 2001, the Plaintiff filed a patent application titled *Method and System for Providing Account Values in an Annuity with Life Contingencies*. That application eventually led to the issuance of the '815 Patent. The original application contained 36 claims. Claim 1 was the only independent claim; claims 2-36 depended on Claim 1. Claims 1, 21, and 28 of the '815, which correspond to the same numbered claims in the '815 Patent, stated:

WHAT IS CLAIMED
1.     A data processing method for administering an annuity product having a
guarantee of lifetime payments, comprising the steps of:
a.     establishing a charge for the guarantee of lifetime payments;
b.     determining an initial benefit payment and paying the initial
payment to a beneficiary;
c.     determining a subsequent periodic benefit payment;
d.     periodically determining an account value; and
e.     periodically paying the subsequent payment and reporting the

4

account value to the beneficiary.

. . .

21.    The data processing method of claim 1, wherein the step of determining a charge for the guarantee of lifetime payments further comprises the steps of determining an asset charge and periodically deducting the asset charge from the account value.

. . .

28.    The data processing step of claim 1, comprising the additional step of providing at least one of a death benefit and a cash surrender benefit.

(Pf. Ex. C, LIN 00074, 00078; DE 36.)

On May 22, 2002, the patent examiner rejected all 36 claims in the patent application under 35 U.S.C. § 103(a) because they were obvious in view of earlier patents.[1] Namely, the examiner found that the claims were unpatentable over U.S. Patent Number 6,275,807 (Schirripa) in view of U.S. Patent Number 5,291,398 (Hagan):

Schirripa discloses a data processing method for administering an annuity product having a guarantee of lifetime payments (col 6, lines 5–45). There is established a charge for the guarantee of lifetime payments (col 9, lines 1–6). An initial benefit payment and subsequent periodic payments are determined (col 5, lines 5–15). An initial payment to a beneficiary is made, periodically paying the subsequent payment and reporting the account value to the beneficiary (col 10, lines 20–50). . . . Subsequent periodic payments are re-determined in the event of a partial withdrawal or additional deposit (col 9, lines 64–67; col 10, lines 1–10). . . .

    Schirripa does not disclose periodically determining an account value. Hagan (828) discloses periodically determining an account value for annuities (col 3, lines 11–19).

    It would have been obvious to one with ordinary skill in the art to include periodically determining an account value for annuities to Schirripa because of

---

[1] Section 103(a) prohibits patenting an invention which subject matter is obvious in light of earlier patents:

    A patent may not be obtained though the invention is not identically disclosed or described . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

*Id.*

5

what is taught by Hagan (828). Hagan (828) teaches periodic determination of
balances for insurance purposes. (col 2, lines 30–37)

(Df. Ex. C, TFLIC–RFP55–93–94; DE 38-4.)

On August 27, 2002, the Plaintiff filed a response to the examiner's rejections by
amending claims 1, 9, and 21 and arguing that neither Schirripa nor Hagan disclosed certain
features recited in the claims:

> In a deferred annuity, an account value is maintained up to the point of
> annuitization. Following annuitization, the concept of an account value ceases to
> exist. Payments are made to the annuitant pursuant to the annuity contract. The
> account value which existed prior to annuitization is exchanged by the annuitant
> for the stream of payments to be received after annuitization. Thus, the account
> value is neither periodically determined nor periodically reported to the annuitant.
> In an immediate annuity, this same process occurs at the time of purchase, where
> the "account value" equals the purchase price of the annuity, less customary
> charges and expenses.
>        In contrast, the present invention (which is applicable in the case of both
> immediate and deferred annuities) maintains the concept of an account value <u>after</u>
> annuitization, and bases certain of its features and benefits on the account value in
> the post-annuitization period. Neither Hagen nor Schirripa disclose such
> methodology.
> . . .
> The present invention provides a method in which account values, and attendant
> benefits, can be provided in the post-annuitization period. This method includes
> establishing a charge associated with the guarantee of lifetime payments, and
> deducting the charge in a variety of ways to render affordable and practical that
> which has previously been neither.

(Pf. Ex. C, LIN 208, 210; DE 36.)

Along with its response, the Plaintiff submitted amended claims which, after another
revision (insubstantial), was approved by the examiner in the following form:

> What is claimed:
> 1.     A data processing method for administering an annuity product
>        having an account value and a guarantee of lifetime payments,
>        comprising the steps of:
>        a.     establishing a charge for paying the lifetime payments after
>               the account value reaches zero in accordance with the

       guarantee;

    b. using a computer:

      1. determining an initial benefit payment;

      2. determining a subsequent periodic payment; and

      3. periodically determining the account value;

    c. periodically paying the initial payment and the subsequent payment and reporting the account value to the beneficiary.

. . .

  21. The data processing system of claim 1, wherein the step of establishing a charge for the guarantee of lifetime payments further comprises the steps of determining an asset charge and periodically deducting the asset charge from the account value.

. . .

  28. The data processing method of claim 1, comprising the additional step of providing at least one of a death benefit and a cash surrender benefit.[2]

('815 Patent, Claims 1, 21, & 28.)

   The Examiner summarized his approval in two sentences: "The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. The user's guide [prior art material] made of record discloses 'post-annuitization' but does not disclose the invention as

---

[2]To highlight the changes from the original claims, the Court provides a redlined version of the final claims (italics indicate additions; strikeouts reflect deletions):

  What is claimed:

  1. A data processing method for administering an annuity product having *an account value and* a guarantee of lifetime payments, comprising the steps of:

    a. establishing a charge for ~~the guarantee of lifetime payments~~ *paying the lifetime payments after the account value reaches zero in accordance with the guarantee*;

    b. *using a computer*:

      1. determining an initial benefit payment ~~and paying the initial benefit payment to a beneficiary~~;

      2. determining a subsequent periodic payment; *and*

      3. periodically determining ~~an~~ *the* account value; ~~and~~

    c. periodically paying *the initial payment and* the subsequent payment and reporting the account value to the beneficiary.

. . .

  21. The data processing ~~method~~ *system* of claim 1, wherein the step of establishing a charge for the guarantee of lifetime payments further comprises the steps of determining an asset charge and periodically deducting the asset charge from the account value.

. . .

  28. The data processing ~~step~~ *method* of claim 1, comprising the additional step of providing at least one of a death benefit and a cash surrender benefit.

claimed in independent claim 1." (Df. Ex. E, TFLIC–RFP55–151; DE 38-6.)

The '815 Patent issued on August 26, 2003.


**B.      Claim Construction Principles**

Claim construction is a matter of law. *See Markman v. Westview Instruments, Inc.*, 517

U.S. 388–91 (1996). It is "the process of giving proper meaning to the claim language." *Abtox,*

*Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997). The disputed terms in a claim are

interpreted in light of the intrinsic evidence and, if necessary, extrinsic evidence. Intrinsic

evidence consists of the contents of the patent—including the specification section and

drawings—and the prosecution history of the patent. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299

F.3d 1313, 1325 (Fed. Cir. 2002). The court begins with the language of the claim itself: "It is a

'bedrock principle' of patent law that 'the claims of a patent define the invention to which the

patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.

2005).

> [T]he words of a claim "are given their ordinary and customary meaning." We
> have made clear, moreover, that the ordinary and customary meaning of a claim
> term is the meaning that the term would have to a person of ordinary skill in the
> art in question at the time of the invention, i.e., as of the effective filing date of
> the patent application.
>      The inquiry into how a person of ordinary skill in the art understands a
> claim term provides an objective baseline from which to begin claim
> interpretation. That starting point is based on the well-settled understanding that
> inventors are typically persons skilled in the field of the invention and that patents
> are addressed to and intended to be read by others of skill in the pertinent art.

*Id.* at 1312–13 (citations omitted).

Certain canons of construction apply to claim interpretation. As a general matter, "claim

terms are presumed to be used consistently throughout the patent, such that the usage of a term in

one claim can often illuminate the meaning of the same term in other claims." *Research Plastics, Inc. v. Fed. Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005). On the other hand, "[w]hen different words or phrases are used in separate claims, a difference in meaning is presumed." *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). "[I]nterpretations that render some portion of the claim language superfluous are disfavored." *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004). Absent specific recitation of order, steps of a method are not construed to have particular order. *See Altritis, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–71 (Fed. Cir. 2003) (absent specific direction in the intrinsic evidence, where neither grammar nor logic indicate specific sequence, no particular order is required).

Although the claims are the crux of patent construction, they are not interpreted in isolation:

> Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. This court explained that point well in *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir.1998):
>
> > It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention-the inventor's lexicography-must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

*Phillips*, 415 F.3d at 1313. Thus, "[a]fter looking to the claim language we consider the rest of the intrinsic evidence, that is, the written description [specification] and the prosecution history if in evidence." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1304

9

(Fed. Cir. 2001).

The specification section of the patent "contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id*. However, the specific embodiments of an invention described in the specification do not limit the scope of the language used in the claims, unless the specification makes it clear that it is coextensive with the claims. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005).

After the specification, the court considers the prosecution history:

> When we use the prosecution history as source material, the prior art cited and the applicant's acquiescence with regard to that prior art indicate the scope of the claims, or in other words, what the claims do not cover. *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 65, 384 F.2d 391 (1967). Furthermore, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed.Cir.2003).

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367–68 (Fed. Cir. 2004). However, "'the prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage.' To be given effect, such a disclaimer must be 'clear and unmistakable.'" *Sunrace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1306 (Fed Cir. 2003) (quoting *Amgen,* 314 F.3d 1313, 1327 (Fed. Cir. 2003), and *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003)). Moreover, *Phillips* has

cautioned courts not to overemphasize prosecution history that is ambiguous. *See Phillips*, 415 F.3d at 1317 ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.") (citing *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002)). Yet, despite these limitations, the prosecution history remains a tool to "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

If, after examination of intrinsic evidence, the meaning of the claims remains ambiguous, the court may refer to extrinsic evidence. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d 967, 980 (Fed. Cir. 1995). "The court may, in its discretion, receive extrinsic evidence in order 'to aid the court in coming to a correct conclusion' as to the 'true meaning of the language employed' in the patent." *Id.* (quoting *Seymour v. Osborne*, 78 U.S. (11 Wall.) 516, 546 (1871)). However, extrinsic evidence cannot contradict or change the meaning of the terms of the claims. Furthermore, because of the inherent bias, the court should be careful to assign too much weight to the inventor's testimony. *See E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("[T]his court has often repeated that inventor testimony is of little probative value for purposes of claim construction."). Expert testimony is more reliable:

> expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention

works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent art.

*Phillips*, 415 F.3d at 1318. Nevertheless, the court should be aware that experts retained by the parties may hold bias toward the party that sustains them. *See id.*

**C.      Claim Construction of the '815 Patent**

The Plaintiff asserts that the Defendant infringed Claims 1, 21, and 28 of the '815 Patent. Claim 1 is the only independent claim that has been asserted. Because Claims 21 and 28 depend upon Claim 1, the Court's interpretation of Claim 1 will control those two claims.

**(1)      *Claim 1***

Claim 1 recites a data processing method to administer an annuity product that has (1) an account value and (2) a guarantee of lifetime payments. The method is comprised of a number of steps: (a) establishing a charge for paying the lifetime benefits after the account value reaches zero; (b) using a computer to determine (i) an initial benefit payment; (ii) a subsequent periodic benefit payment; and (iii) to periodically determine the account value; and (c) periodically paying the initial payment and the subsequent payment and reporting the account value to the beneficiary. The Court will now examine the disputed phrases within Claim 1.

(a)      *A data processing method for administering an annuity product having an account value and a guarantee of lifetime payments.*

(i)      Annuity Product.

12

The parties disagree what the term "annuity product" means. The Defendant insists that the "annuity product" as used in the '815 Patent "means a contract providing for periodic payments to a beneficiary, said payments beginning after the date of annuitization." (Df. Br. at 20; DE 39-2.) The Defendant maintains that the Plaintiff disclaimed in the specification and prosecution history that the term "annuity product" also applies to the pre-annuitization period.

The Plaintiff proposes a broader definition. It urges the Court to interpret "annuity product" as "a fixed, variable, deferred, immediate, or other annuity contract or contract option that guarantees the payment of a sum of money at intervals of time." The Plaintiff believes that this definition is consistent with the following: the express language of the claim, which does not use the word "annuitization;" the specification; the general purpose dictionaries; and industry definitions. (Pl. Br. at 13; DE 34.)

The Court agrees with the Plaintiff that the term "annuity product" is used generally to describe fixed, variable, deferred, immediate or other annuity contract or contract option that guarantees the payment of a sum of money at intervals of time. (*See* '815 Patent 5:45–53; 10:15-19.) The term, although narrowed down by subsequent qualification—having an account value and a guarantee of lifetime payments—is meant to let the person of ordinary skill in the art know that the invention covers a wide array of annuities: fixed, variable, deferred, immediate, and other annuities. This is the term's ordinary and customary meaning that is apparent on the face of the Claim. In addition, this meaning is consistent with the specification and the prosecution history. The term "annuity product" does not refer to a particular phase of annuity contracts but to the general concept of annuities—contracts that guarantee periodic payments.

(ii)     Account Value.

As noted above, Claim 1 speaks of an annuity product "having an account value and a guarantee of lifetime payments." The parties agree with the dictionary definitions of account value and lifetime payments but disagree how these terms apply to Claim 1. Thus, both the Plaintiff and the Defendant note that the account value refers to the economic value or proceeds associated with an annuity contract. However, while the Plaintiff puts a period at the end of that definition, the Defendant goes on to add "[value] that is maintained in the post-annuitization phase." Similarly, while agreeing on what a guarantee of lifetime payments is, the parties diverge on whether the term "payment" should be read as the "payment in the post-annuitization phase." In addition, the Defendant distinguishes payments from withdrawals whereas the Plaintiff treats them the same.

The Plaintiff vigorously objects to defining the account value only to apply to the post-annuitization phase. It claims that the invention seamlessly combines the pre- and post-annuitization phases and any reference to the annuitization contradicts the express language of the Claim, which did not include the word annuitization. At the same time, the Plaintiff "acknowledges that an 'annuitization' concept is expressly built into the guarantee of lifetime income benefits from the preamble of claim 1." (Pl. Supp. Br. at 8; DE 63-1.) For this reason, the Plaintiff believes that "adding the words 'annuitization' or 'post-annuitization' into claim 1 renders existing claim limitation superfluous or redundant." (*Id.*)

As used in the '815 Patent, the account value and the guarantee of lifetime payments are intricately related. After all, the existence of these two concepts alongside each other is the essence of the invention. However, the Plaintiff's initial application for the patent in 2001 did

not reflect this idea clearly. In that application, the first sentence of the Claim had no reference to

the account value: "What is claimed: A data processing method for administering an annuity

product having a guarantee of lifetime payments." (Pf. Ex. C, LIN 00074; DE 36.) The account

value was not mentioned until step (e): "periodically paying the subsequent payment and

reporting the account value to the beneficiary." (*Id.*) The examiner turned down that application

for obviousness reasons in light of previous art in Hagan and Schirripa. He explained:

> Schirripa discloses a data processing method for administering an annuity product having a guarantee lifetime payments (col 6, lines 5–45). There is established a charge for the guarantee of lifetime payments (col 9, lines 1–6). An initial benefit payment and subsequent periodic benefit payments are determined (col 5, lines 5–15). An initial payment to beneficiary is made, periodically paying the subsequent payment and reporting the account value to the beneficiary (col 10, lines 20–50). . . . Subsequent periodic payments are re-determined in the event of a partial withdrawal or additional deposit (col 9, lines 64–67; col 10, lines 1–10). . . .
>
> Schirripa does not explicitly disclose periodically determining an account value.
>
> Hagan (828) discloses periodically determining an account value for annuities (col 3, lines 11–19).
>
> It would have been obvious to one with ordinary skill in the art to include periodically determining an account value for annuities to Schirripa because of what is taught by Hagan (828). Hagan (828) teaches periodic determination of balances for insurance purposes (col 2, lines 30–37).

(Df. Ex. C, TFLIC–RFP55–00093–94; DE 38-4.)

In its response to the examiner, along with other changes, the Plaintiff amended the first

sentence of Claim 1 to explicitly state that it claimed a "data processing method for

administering an annuity product having an account value and a guarantee of lifetime payments."

In addition, the Plaintiff submitted a brief in which it distinguished Schirripa and Hagen from its

invention:

> In a deferred annuity, an account value is maintained up to the point of annuitization. Following annuitization, the concept of an account value ceases to

exist. Payments are made to the annuitant pursuant to the annuity contract. The account value which existed prior to annuitization is exchanged by the annuitant for the stream of payments to be received after annuitization. Thus, the account value is neither periodically determined nor periodically reported to the annuitant. In an immediate annuity, this same process occurs at the time of purchase, where the "account value" equals the purchase price of the annuity, less customary charges and expenses.

In contrast, the present invention (which is applicable in the case of both immediate and deferred annuities) maintains the concept of an account value after annuitization, and bases certain of its features and benefits on the account value in the post-annuitization period. Neither Hagen nor Schirripa disclose such methodology.

. . .

The present invention provides a method in which account values, and attendant benefits, can be provided in the post-annuitization period. This method includes establishing a charge associated with the guarantee of lifetime payments, and deducting the charge in a variety of ways to render affordable and practical that which has previously been neither.

(Pf. Ex. C, LIN 208, 210; DE 36.)

The examiner approved the amended application and issued the '815 Patent. In his approval, the examiner concluded that prior art "made of record discloses 'post-annuitization' but does not disclose the invention as claimed in independent claim 1." (Df. Ex. E, TFLIC–RFP55–151; DE 38-6.)

The above examples demonstrate that the novelty of the Plaintiff's invention concerning the account value is limited to the distribution, or post-annuitization, phase of the annuity contracts. The Plaintiff did not invent the concept of account value. At the time of the Plaintiff's patent application, the account value was an established tool in administering annuities. However, as the Plaintiff explained to the examiner, this principle existed only in the deferral, or accumulation, phase of the annuity, and ceased once the disbursements began.

In fact the examiner rejected the Plaintiff's application, believing that it contained the same principle of the account value as previous art, that is, the account value in the pre-

16

annuitization phase of the annuity. The Plaintiff overcame this rejection by clarifying that the account value in the '815 Patent was different from previous art, Schirripa and Hagen in particular, because it was not limited to the deferral phase of the annuity but carried on to the post-annuitization phase. Thus, the essence of the invention, as claimed by the Plaintiff, was the annuity with the account value in the distribution, or post-annuitization, phase of the annuity.

Having made clear to the examiner that its invention was the existence of the account value in the post-annuitization phase of the annuity, whereas previous art maintained the same only during the pre-annuitization phase, the Plaintiff is precluded from claiming that no limitations should be imposed on that term. The Plaintiff's argument to the examiner and the specification make an explicit record of disavowing the application of the account value to the pre-annuitization phase, a concept already covered by Schirripa and Hagen. This is not a case of ambiguous prosecution history that could be interpreted numerous ways. Rather, taken together, the Plaintiff's file informs a person of ordinary skill in the art that the Plaintiff's claim is narrower than it now claims it to be. Therefore, the Court construes the term "account value" to mean the monetary value that is maintained in the post-annuitization phase.

The Plaintiff complains that such interpretation is unwarranted because the meaning of the word "annuitization" is uncertain. That is not true. The Plaintiff itself has consistently acknowledged that its invention has an annuitization concept expressly built into the guarantee of lifetime benefits. (Pl. Supp. Br. at 8; DE 63-1.) Moreover, the Plaintiff has asserted numerous times to the examiner that its invention was novel because it maintained the account value of the annuity contract in the post-annuitization, that is the distribution, phase. Accordingly, the Court understands the annuitization to mean the point when the annuitant starts to receive regularly

scheduled payments from the annuity. This meaning is consistent with both the Plaintiff's own and the general usage of that term.

The Plaintiff also insists that narrowing the term "account value" to post-annuitization phase makes the term "a guarantee of lifetime payments" superfluous, as "lifetime payments" are by definition limited to post-annuitization phase. Such is not the case. The term "account value" does not qualify the term "a guarantee of lifetime payments." These terms are independent of each other and defining the first one to apply only in the post-annuitization phase does not render the second one superfluous. In fact, the use of the two terms side-by-side, one of which by definition is limited to the post-annuitization phase, is consistent with the Court's interpretation that the account value is also limited to the post-annuitization phase.


(iii)     Guarantee of lifetime payments.

The Plaintiff is correct that "a guarantee of lifetime payments" by its definition contains the annuitization concept, and adding "in the post-annuitization phase" would be redundant. The word "payments" necessarily refers to distribution, payout, or post-annuitization phase. Therefore, although the Defendant insists that the phrase be qualified by inserting "in the post-annuitization phase," the addition is unnecessary as that meaning is already apparent. The Defendant otherwise agrees with the Plaintiff that "guarantee of lifetime payments" means a guaranteed distribution of money for the lifetime of a designated individual or individuals, and that is also the definition the Court finds to be appropriate.


(iv)     Payment is not a withdrawal.

The parties disagree whether a withdrawal can be classified as a payment, as that word is used in the '815 Patent. The Defendant insists that a payment is not a withdrawal. It submits that withdrawals are owner-initiated transactions, whereas benefit payments are not. The Plaintiff, on the other hand, believes that the two words mean the same thing as withdrawal is simply a form of a payment. That is, regardless of who initiates a transaction, the insurer is the one that issues the money—makes a payment—to the insured. In addition, the Plaintiff submits that a withdrawal constitutes a form of a guaranteed lifetime payment, so long as it is guaranteed and paid out of the account value.

As used in the '815 Patent, the word "payment" is not the same as "withdrawal." "Payments" correlate with "lifetime guarantee," including the guarantee of payments after the account value reaches zero. If withdrawals were payments, they also would be guaranteed for lifetime, but that is impossible as withdrawals cannot continue after the account value reaches zero. Nor are withdrawals a synonym for payments before the account value reaches zero. Claim 36 uses the words "withdrawal" and "payment" in different senses: "The data processing method of claim 1, further comprising the steps of providing for partial withdrawals or additional deposits by the beneficiary, and redetermining the subsequent periodic payment in the event of a partial withdrawal or additional deposit." ('815 Patent 18:1–5; Claim 36.) Similarly, Claim 32 has a formula in which the account value is determined by subtracting withdrawals and gross benefits (benefit payments) from the total value of the account. If payments and withdrawals had identical meaning, using either "withdrawals" or "payments" in both instances would have sufficed. The use of different words side-by-side presumes a different meaning of those words. Moreover, since Claim 1 uses the word "payments" and does not use the word "withdrawal," but

Claims 32 and 36 use the word "withdrawal," a difference in meaning between "payments" and "withdrawals" is presumed. *See Nystrom*, 424 F.3d at 1143 ("When different words or phrases are used in separate claims, a difference in meaning is presumed.").

That the two words have separate meanings is also underscored by the language in the specification: "Because this invention provides an account value, the insurer may also decide to allow partial withdrawals and additional deposits. If either of these types of *owner-initiated* transactions occurs, the future guaranteed benefit payments must be adjusted accordingly." ('815 Patent 13:20–24 (emphasis added).)

(b)      *. . . comprising the steps of . . .*

The parties disagree whether the phrase "comprising the steps of" mandates the steps that follow to be taken in the order they are listed within the claim. The recited steps are:

> a.    establishing a charge for paying the lifetime payments after the account value reaches zero in accordance with the guarantee;
> b.    using a computer:
>> 1.    determining an initial benefit payment;
>> 2.    determining a subsequent periodic payment; and
>> 3.    periodically determining the account value;
> c.    periodically paying the initial payment and the subsequent payment and reporting the account value to the beneficiary.

The Defendant does not address the established usage of the phrase "comprising the steps of." Rather, it argues that the steps make sense only if they are carried out in the listed order. The Plaintiff counters this assertion by submitting a specific meaning of the phrase and by insisting that no certain order is mandated by the logic or grammar of the steps.

Generally, absent specific recitation of order, steps of a method are not construed to have particular order. *See Altritis, Inc.*, 318 F.3d at 1369–71 (Fed. Cir. 2003). Barring the steps of

determining the amount of payments, paying the payments, and determining the account value, Claim 1 is not an exception to this rule. The logic of the steps does not mandate the order in which the payments are determined. For example, there is no inherent requirement to determine the subsequent payments only after the amount of the initial payment is decided. The amounts of these payments are dependent variables but can be set in any order. Similarly, the charge for paying the lifetime payments after the account value reaches zero can be set either before or after the initial and subsequent payments have been determined. Of course, following a certain order to determine the amount of payments and charges may make better business sense, but that is different from a mandated order. A requirement for a valid patent is that it is functional, not that it is perfect.

That the order of the steps is not set in stone is also confirmed by the ordinary meaning of the phrase "comprising the steps of." This phrase connotes an open ended claim that allows additional steps. *See Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."). Since the claim is not foreclosed to additional steps, the steps themselves are not foreclosed from being carried out in a different order than stated in the claim.


(c)    *Establishing a charge for paying lifetime payments after the account value reaches zero in accordance with the guarantee.*

The first step of Claim 1 speaks of "establishing a charge for paying lifetime payments after the account value reaches zero in accordance with the guarantee." The parties disagree on what "establishing a charge" means. The Plaintiff proposes to "define 'establishing a charge' as the 'creation or establishment' of a charge, which is the 'cost or fee paid to the entity offering the

annuity to guarantee periodic payments after such payment and/or charges have exhausted the account value . . .'" (Pl. Br. at 21; DE 34.) The Defendant contends that "establishing" means calculating a fee in one of three ways set forth in the patent, said fee to be paid by the owner for the contract guarantee of lifetime payments." (Df. Br. at 25; De 39–2.) The Defendant cites the specification ('815 Patent 10:33–35) in support of its interpretation. In addition, the Defendant asserts that the word "charge" "as used in the '815 Patent means a fee paid by the owner thereby making the account value available in the post-annuitization phase." (Df. Br. at 25; DE 39-2.)

The '815 Patent does not limit the establishment of charge to only the three methods listed in column 10 of the specification. Column 10 states:

> In certain embodiments of the present invention, the cost of the lifetime guarantee may be charged by one or more of three methods. The first method is a front-end charge, or 'premium load' . . . . The second method is a charge which is deducted from each benefit payment as it is paid. . . . The third method is an asset charge which is deducted daily from the account value. . . .

('815 Patent, 10:33–48.) At first glance, this may appear as a complete list of available methods to impose a charge for the guarantee of lifetime benefits. However, an earlier reference to the cost of the lifetime guarantee makes clear that the three methods are not exclusive:

> The charge for the guarantee of lifetime payments may be established in *various ways*, *including* determining a front end charge and deducting the front end charge from an initial deposit, determining a charge to be deducted from each periodic benefit payment, or determining an asset charge and periodically deducting the asset charge from the account value.

('815 Patent, 6:8–15 (emphasis added).) But most importantly, as discussed above, the term of art used in Claim 1—"comprising the steps of"—signifies that the claim is open-ended. In light of this evidence, the Court construes the term "establishing a charge" not to be limited to the three methods noted in column 10:33–55.

The Defendant's argument regarding the meaning of the word "charge" need not be addressed. The Defendant does argue that a charge is not what the Plaintiff claims it to be, that is, a cost or fee for the benefit provided. Rather, the Defendant merely reiterates its position that the account value is limited to the post-annuitization phase of the contract. Since the Court has already addressed the scope of the account value, and the parties agree what a charge is, no further discussion is necessary.

(d)     *Using a computer*

Step (b) of Claim 1 adds the limitation of "using a computer." The Plaintiff proposes to define the term "to mean that the sub-steps recited in elements (b)(1), (b)(2), and (b)(3) are carried out on or with the aid of a computer." (Pl. Br. at 24; DE 34.) The Defendant suggests that "'using a computer' as used in the '815 Patent means employing a computerized data processing method to calculate benefit payments based upon preexisting formulas and, further, to determine the annuity account value." (Df. Br. at 26; DE 39–2.) The Defendant believes this to be the case because insurance is a formula driven business. In addition, the Defendant submits that the Plaintiff's use of formulas within the '815 Patent are consistent with that interpretation.

The Defendant's interpretation is too narrow. The claim does not contain any formulas, and there is no otherwise clear implication in the specification that the use of the computer must be based upon pre-existing formulas. Likewise, the fact that many of the dependant claims contain specific formulas to calculate benefit payments and account value (*e.g.*, 4, 8, 14–16, 23, 27, and 32) creates a presumption that Claim 1 is not so limited. *See Phillips*, 415 F.3d at 1323 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a

presumption that the limitation in question is not present in the independent claim.")

Accordingly, the Court construes the phrase "using a computer" as meaning the use of a

computer to aid in performing the sub-steps in (b)(1)–(b)(3).

(e)     *Determining an initial benefit payment*

Sub-step (b)(1) of Claim 1 is "determining an initial benefit payment." The parties'

disagreement regarding this phrase rests with the difference on whether the first benefit payment

should be defined to occur in the post-annuitization phase of the contract. The Defendant argues

that it should be. It also narrows the term by submitting that the first payment is based upon pre-

existing formulas. The Plaintiff denies a requirement of any pre-existing formulas and defines

the term "first benefit payment" as "a first amount of money to be paid under the annuity

contract." (Pl. Br. at 25; DE 34.)

For the reasons stated above, the Court declines the Defendant's invitation to import into

Claim 1 the concept of pre-existing formulas. As to the parties' second contention, the Court

notes that, by definition, the first payment, since it is not a withdrawal, must take place in the

distribution phase, also known as payout or post-annuitization phase. The same is true of

"subsequent periodic benefit payment."

**(2)     *Claim 21***

Claim 21 states: "The data processing system of claim 1, wherein the step of establishing

a charge for the guarantee of lifetime payments further comprises the steps of determining an

asset charge and periodically deducting the asset charge from the account value." ('815 Patent,

Claim 21, 15:63–67.) Both parties agree that the asset charge is a cost or fee based on assets. They disagree, however, at what intervals the charge must be assessed. The Defendant points to the '815 Patent, column 10:46–55, and claims that the asset charged must be deducted daily. The Plaintiff objects to such interpretation as inconsistent with the language of the claim itself and with the specification.

Claim 21 does not require a daily deduction of asset charges. Although the '815 Patent describes an embodiment in which the asset charge is deducted daily, (*see* '815 Patent, 10:456–55), neither Claim 21 nor the specification require a daily deduction. The Court will not convert a singular example in the specification into a limitation of a claim. *Cf. Phillips*, 415 F.3d at 1323 (ordinarily, claims are not limited to the preferred embodiment disclosed in the specification). Indeed, at column 7, 25–28, the specification provides generally that the "charge for the guarantee of lifetime payments is an asset charge *periodically* deducted from the account value." *Id.* (emphasis added).

**(3)**     ***Claim 28***

Claim 28 states: "The data processing method of claim 1, comprising the additional step of providing at least one of a death benefit and a cash surrender benefit." The parties agree with what this claim means, with one recurring exception: whether death benefit and cash benefit should be construed to occur in the post-annuitization phase. Again, for the reasons already explained, the common sense interpretation of benefits consisting of payments is to construe them occurring in the payout phase of the contract, also known as the distribution or post-annuitization phase.

**CONCLUSION**

The Court has interpreted the contested phrases in the Plaintiff's '815 Patent. The next step in this litigation is to determine whether the Defendant infringed the Plaintiff's Patent. The Court will set a schedule for the remainder of this case at the March 26, 2007, telephonic conference.

SO ORDERED on March 6, 2007.


   S/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT